IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 10, 2017 Session

## STATE OF TENNESSEE v. DAVID SHARP

**Appeal from the Circuit Court for Maury County**
**No. 24322    Robert L. Jones, Judge**

_____

### No. M2016-01072-CCA-R3-CD

_____

A Maury County Circuit Court Jury convicted the Appellant, David Sharp, of evading arrest, a Class E felony, and driving on a revoked license, a Class B misdemeanor. After a sentencing hearing, he received an effective eighteen-month sentence to be served as ninety days in jail and the remainder on supervised probation. On appeal, the Appellant contends that the trial court erred by allowing the State to introduce a photograph into evidence to rebut a defense witness's testimony and that the evidence is insufficient to support the convictions. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court erred by admitting the photograph and that the error was not harmless. Therefore, the Appellant's convictions are reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed,**
**Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. ROBERT H. MONTGOMERY, JR., J., concurred in results only.

Joshua D. Miller, Columbia, Tennessee, for the appellant, David Sharp.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Brent Cooper, District Attorney General; and Scott Speer, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In June 2015, the Maury County Grand Jury indicted the Appellant for driving on a revoked license in count one, leaving the scene of an accident in count two, and evading arrest in count three. The State dismissed count two on the morning of trial.

At trial, Officer Tanner Babb of the Columbia Police Department (CPD) testified that in the early morning hours of October 18, 2014, he and other officers conducted a "bar check" at Tommy's Tavern on Riverside Drive. He explained that the purpose of a bar check was to make sure there were no problems inside or outside the bar and to "show a [police] presence." After the bar check, the officers left the building. As they were walking through the parking lot to their police cars, Officer Babb heard "a crash." He looked toward the sound, saw a light pole swaying, and stated to the other officers that "somebody just hit that pole with a car." The officers ran toward the wooden pole, and Officer Babb saw a white, Chevrolet Cavalier "still backed up into the pole."

Officer Babb testified that all of the officers yelled for the driver of the Cavalier to stop. The car "stopped for a second" but then "just took off." Officer Babb said the car's tires were spinning and "throwing" gravel. Other officers were closer to the car than Officer Babb, but he did not know exactly where they were standing. The Cavalier pulled onto Riverside Drive, and Officer Babb, who was standing on Riverside, moved out of the way. He said that he was within thirty-five to forty feet of the car and that he was in fear. The State asked if he was sure the driver of the car saw the officers, and he answered, "I would think so. There was five or six of us standing there pointing flashlights. We were yelling at him. All of us were screaming at him. I would think that the driver of that vehicle saw us." Officer Babb said that Riverside Drive had street lights but that the parking lot was lit by only one light, which was the one hit by the Cavalier. He never saw the driver.

Officer Babb testified that he ran to his patrol car, activated his car's emergency equipment, and turned onto Riverside. However, his windshield fogged up, so he had to stop in the middle of the road. When his windshield cleared, he looked for the Cavalier on Riverside but could not find it and returned to Tommy's Tavern. Officer Trent Thomson, who was also on the scene, "ran" the first three digits of the Cavalier's license plate and learned it was registered to someone who lived on Bass Drive. The police department's "in-house system" also returned a report associated with the Cavalier, and the report "attached" the Appellant to the vehicle. At that point, Officer Thomson ran the Appellant's driver's license number, and the officers saw the Appellant's driver's license photograph.

Officer Babb testified that he and another officer decided to go to the residence on Bass Drive. When they arrived, the residence was dark, and the Cavalier was not there. The officers knocked on the front door, and a man answered. The man said he did not know if the Appellant was there because his daughter and the Appellant lived in an apartment downstairs. The officers walked down the driveway to the apartment, and

Officer Babb knocked on a set of French doors on the side of the house. Dogs in the apartment were barking and "going nuts." However, no one answered the door or turned on any lights, so the officers left. Officer Babb said he filed warrants for the Appellant's arrest, charging the Appellant with leaving the scene of an accident and eluding in a motor vehicle. The Appellant later spoke with an officer on the telephone and turned himself in to the police.

On cross-examination, Officer Babb testified that the Cavalier was registered to Christina Sharpe[1] and that it was traveling thirty to forty miles per hour by the time it passed him. Although the parking lot was lit by only one light, the area was "very bright." The incident in the parking lot occurred about 2:00 a.m., and Officer Babb arrived at the home on Bass Drive ten to fifteen minutes later. Officer Babb examined the wooden pole when he returned to Tommy's Tavern, and it did not appear to be damaged.

Officer Trent Thomson of the CPD testified that he assisted with the bar check at Tommy's Tavern on October 18, 2014. Afterward, the officers were outside talking when they heard "a loud boom." They looked toward the sound and saw a light pole shaking and "the rear end of a white car." The officers ran toward the car and yelled for it to stop.

Officer Thomson testified that the car pulled out of the parking lot and came toward the officers, who were standing on Riverside Drive. The car was traveling about fifteen miles per hour and slowed but never came to a complete stop. Officer Thomson was standing at the car's front passenger side quarter-panel, near the right front tire, and put his right hand on the hood of the car and his left hand on the windshield. He said the car almost hit the officers and was traveling three to five miles per hour at that time. Officer Thomson continued to order the driver to stop, but the car "waded through the officers" and "sped off very quickly." Officer Thomson looked through the windshield and saw the driver for about three seconds. He identified the Appellant at trial as the driver.

Officer Thomson testified that his police car was about twenty-five feet away and that he ran to his car. However, by the time he got to his car and "got turned around" to follow the white car, he was unable to catch up to it. He heard over the radio that another officer had obtained a partial license plate number of "212," so he parked his car and searched the police department's "in-house system" for a matching plate. The search returned only one result and reported that the car was a white Cavalier, which matched the description of the fleeing car. The Cavalier was also "attached to an incident" in which the Appellant was the driver. Based on that information, Officer Thomson obtained the Cavalier's entire license plate number and learned it was registered to

---

[1] Christina Sharpe's last name is spelled with an "e."

Christina Sharpe on Bass Drive. He also learned the Appellant's driver's license number and used the number to obtain the Appellant's Department of Motor Vehicles records, which revealed that the Appellant's driver's license had been revoked. The records showed the Appellant's driver's license photograph, and Officer Thomson immediately recognized the Appellant as the driver of the Cavalier. Officer Thomson showed the photograph to Sergeant Brian Goats and Officer Payton Holland, who also had seen the driver of the Cavalier, and they agreed the Appellant was the driver.

Officer Thomson testified that he forwarded the information he had obtained to Officer Babb and accompanied Officer Babb to the home on Bass Drive in order "to attempt to make contact." Officer Thomson did not see the Cavalier at the home but spoke with the occupants of the residence. There was no indication anyone was in the downstairs apartment.

On cross-examination, Officer Thomson testified that after the officers heard the Cavalier hit the pole, they ran toward the Cavalier. He acknowledged that he saw the driver of the Cavalier for only three seconds. Officer Thomson described the driver as a white male with a medium build and short- to medium-length hair. The driver's hair was wavy, and his bangs were "curled a little bit." The driver also had a brown goatee. Although Officer Thomson made eye contact with the driver, he could not remember the color of the driver's eyes.

Officer Thomson acknowledged that the Cavalier never stopped and that he "kind of reach[ed] out and grabb[ed] at a moving vehicle." Defense counsel asked if he was in fear for his safety, and he answered, "At that moment in time, I was trying to get that vehicle to stop." His flashlight was still on his belt, so he was unable to shine it into the car. He said, though, that "[s]omething was illuminating [the driver's] face whether it be the glow of the street light, whether it be another officer's flashlight." Officer Holland and Sergeant Goats were also at the car's passenger side and were standing to the left of Officer Thomson. Officer Thomson said he did not know where Officer Babb was standing. Officer Babb was the reporting officer for this incident, but Officer Thomson wrote a supplemental report. He acknowledged that he did not write the report until February 8, 2015, the same month the Appellant was arrested,[2] but said he remembered the incident "very vividly" when he wrote it. He also acknowledged testifying at the Appellant's preliminary hearing. Defense counsel played an audio-recorded portion of Officer Thomson's testimony, and Officer Thompson acknowledged stating at the hearing that his left hand was on the Cavalier's side mirror, not the windshield. He also acknowledged that he was not "100 percent sure" where his left hand was positioned on the car.

Sergeant Brian Goats of the CPD testified that after he assisted with the bar check

---

[2] The Appellant's judgments of conviction reflect that he was arrested on February 6, 2015.

at Tommy's Tavern on October 18, 2014, he heard "a loud crash" in the parking lot and saw a light pole moving. A white Cavalier had backed into the pole, and police officers started ordering the car to stop. Sergeant Goats, Officer Holland, and Officer Thomson ran to the car's passenger side. Sergeant Goats said that he got within five or six feet of the car and that he probably could have touched it if he had continued running. He said that Officer Holland was in front of him and that he thought Officer Thomson was behind him.

Sergeant Goats testified that the vehicle stopped briefly after it hit the pole but that it "took off when it saw us running toward it." The car accelerated quickly and left the parking lot "as fast as it could." Sergeant Goats looked through the windshield and saw the driver, whom he identified at trial as the Appellant. From a partial license plate number, Officer Thomson was able to determine the name of the Cavalier's owner and that the Appellant was associated with the vehicle. Officer Thomson also was able to pull up a photograph of the Appellant from his driver's license. Sergeant Goats viewed the photograph and had no doubt the Appellant was the driver. Sergeant Goats searched for the Cavalier in the Riverside Drive area but was unable to find it.

On cross-examination, Sergeant Goats testified that the incident occurred about 2:00 a.m. The area was lit "[f]airly well," and "[t]here was a pole with a light on it right there." Sergeant Goats never touched the Cavalier but "was pretty close to it." He said that he ran "more toward the front end of the fender of the passenger's side" and that he could see only Officer Holland, who was to his immediate left and within "an arm's reach" of him. Regarding Officer Thomson, Sergeant Goats stated, "Officer Thomson would be more over to my [right] shoulder or side, you know, peripheral maybe at best, but not directly in my line of sight." When Sergeant Goats got to the Cavalier, he was near the right front tire. He did not know where Officer Thomson was located.

Sergeant Goats testified that he only saw the Appellant for a few seconds and that the Appellant was wearing a baseball cap. Sergeant Goats stated, "He didn't look the same as he looks exactly today. He did have facial hair that day also, a goatee." The Appellant's hair and goatee were brown, and Sergeant Goats could not see the Appellant's eye color. After Sergeant Goats looked for the Cavalier, he returned to Tommy's Tavern with Officer Babb and made contact with the owner of the business. The bar had surveillance cameras, but they were not operational at the time of the incident. Sergeant Goats said he did not ask anyone in the bar if they had seen the Appellant because he had "three officers who agreed 100 percent that it was him."

On redirect examination, Sergeant Goats explained that he was sure only about the location of Officer Holland because "he was directly to my left to the point where I could almost touch him." He acknowledged that the incident changed rapidly and that his attention was focused on the Cavalier most of the time.

- 5 -

Officer Payton Holland of the CPD testified that he assisted with the bar check and heard "a loud commotion come from the front of the business." As the officers went to investigate, they saw that a white Cavalier had hit a pole. Officer Holland, Sergeant Goats, Officer Thomson, and Officer Babb began "moving in that direction." Officer Holland said that Sergeant Goats and Officer Thomson were "directly next to" him and that the three of them had their flashlights out. They were flashing their lights at the driver and saying, "Columbia Police Department." As they got closer to the Cavalier, the car was "not really moving." However, it began to pull away and suddenly accelerated. The car passed Officer Holland, Sergeant Goats, and Officer Thomson and traveled on Riverside Drive toward the downtown area.

Officer Holland testified that he was able to see into the vehicle, and he identified the Appellant at trial as the driver. He said that the officers got within ten feet of the Cavalier and that he noticed a Planet Fitness sticker in the lower, right-hand corner of the back window and the first three digits of the license plate, 212. The State showed him a photograph of a white Cavalier, and he identified it as the car he saw on October 18, 2014.

Officer Holland testified that the officers went to their police cars. Officer Holland searched the area for a couple of minutes and radioed the partial license plate number. Officer Thomson used the number to obtain a photograph of the Appellant and showed it to the other officers on his laptop computer. Officer Holland had seen the driver less than fifteen minutes earlier and was able to say the Appellant was the driver. Officer Holland went with other officers to a residence on Bass Drive, but the Cavalier was not in the driveway or behind the house.

On cross-examination, Officer Holland testified that, like Officer Thomson, he filed his supplemental report on February 8, 2015. He said that despite the passage of time, "[i]t is an adrenaline moment. It's a high intensity moment. You have a car accelerating [past] you. There are some things you just don't forget and [are] able to look in very closely to see distinguishing marks on the person's face." He stated that Sergeant Goats was correct in that Sergeant Goats was near the Cavalier's front passenger wheel. Sergeant Goats was standing between Officer Holland and Officer Thomson. Officer Holland was facing the rear of the Cavalier, so Sergeant Goats and Officer Thomson were behind him. When Officer Holland looked at the driver, the Cavalier was traveling about five miles per hour. However, the car then accelerated very quickly. Officer Holland saw the driver for about three seconds. He was shining his flashlight into the car and had it "constantly at the driver." Other officers also were shining their flashlights, but Officer Holland could not say which officers.

Officer Holland described the driver as a white male with "a goatee-mustache combo of some sorts." The driver had a "solid head" of hair. The hair was "not long" and was brown or black. Officer Holland checked the address history for the Appellant,

and "[o]ne of the addresses that came back was to a Hohenwald address."  Therefore, Officer Holland notified the Lewis County Sheriff's Department that the Cavalier could be entering that jurisdiction.  About three hours later, the Lewis County notified Officer Holland that a car matching the description and traveling at a high rate of speed was leaving Hohenwald and heading back into Maury County.  Officer Holland notified the Maury County Sheriff's Department that the car was returning to Maury County, but he did not know if the sheriff's department attempted to intercept the vehicle.  Officers with the CPD checked the residence on Bass Drive several times until 6:00 a.m. to see if the car had returned to the home.  At the conclusion of Officer Holland's testimony, the State rested its case.

Christina Sharpe, the Appellant's girlfriend, testified that she and the Appellant had never been married to each other and that, unlike the Appellant, she spelled her last name with an "e."  In October 2014, Sharpe lived in a "split duplex" and owned a white Chevrolet Cavalier.  Her parents lived upstairs, and she shared a driveway with them and her brothers.  Five or six cars were usually in the driveway, and Sharpe normally parked her car at the end of the driveway, close to the road, because she was "the one in and out most of the time."  Sharpe also owned a Dodge pickup truck, which she described as her "work vehicle."

Sharpe testified that her parents and five brothers, who were at the home on a daily basis, had access to the Cavalier.  She stated that she left the keys in the vehicle and that whenever anyone needed to leave, "that's the vehicle they take."  The neighbors across the street also used the car if they needed it.  Sharpe's father and one of her brothers were regular visitors to bars and taverns, and all of her brothers had a beard or goatee.

Sharpe testified that on the night of October 17, she and the Appellant went to bed between 10:30 and 11:00 p.m.  About 2:00 a.m., Sharpe's mother came downstairs, knocked on Sharpe's bedroom door, and told them that "cops [had been] knocking at her residence upstairs looking for [the Appellant]."  Sharpe stated that the Appellant was "freaking out" and that she told him to go back to bed because there was nothing they could do at that time.  Later that day, Sharpe spoke with a police officer on the telephone and asked that an officer come to her home.  An officer did so, and she told him that the Appellant could not have been the driver because he "wasn't around" that night.  Sharpe acknowledged that she lied to the officer.  She explained that at the time of the incident, she and the Appellant were having "relationship problems" and that a court order prohibited him from being at her home.  Therefore, she did not tell the officer that the Appellant had been in bed with her.

Sharpe testified that in a previous incident involving Officer Thomson, he misidentified one of her brothers and gave him a ticket "on my other brother's name."  Sharpe stated, "I went to court with my brother, because of course I was there and explained to the judge that it was not him, it was the other brother.  They eventually

charged the other brother and he is on probation." Sharpe acknowledged that her brothers had goatees and looked similar. Sharpe identified a photograph of the Appellant showing him clean-shaven, with short hair, and wearing a baseball cap. She said that she took the photograph at her home on October 13, 2014, and that the Appellant also was clean-shaven on October 18.

On cross-examination, Sharpe acknowledged that date shown on the photograph, October 13, referred to the date she "posted" the photograph on Facebook. She insisted that she took the photograph that same day but acknowledged that she could have taken the photograph anytime. Sharpe said the Appellant could use her car whenever he needed it. Although many people had access to her car, "[t]hey're not normally out [and] about at 2:00 o'clock in the morning." Sharpe said she left her car in the driveway on the night of October 17 and acknowledged that she did not know where the car was in the early morning hours of October 18. On the morning of October 18, Sharpe's aunt was walking her dog and found Sharpe's Cavalier in an alley "over by Riverside." Sharpe said that her aunt lived about eight blocks from Sharpe's home on Bass Drive and that her aunt was surprised to find the car there.

Sharpe testified that when she later spoke with a police officer at her home, he told her that her license plate number was "515 something." Sharpe told him, "[N]o, my tag number is 212." The officer then photographed her license plate and obtained her correct license plate number for the first time. The State showed Sharpe a photograph of her car, and she acknowledged that a Planet Fitness sticker was on the rear window.

Sharpe testified that she told the officer that the Appellant could not have been driving her car on October 18 because she and the car were at a friend's house in Lewisburg. She also told him that she thought the Appellant was in Chattanooga and that she had not seen him for several weeks. Sharpe acknowledged lying to the officer but stated, "I didn't want either of us to get in trouble for being together when we weren't supposed to be, because there was a court order." She said she lied to protect herself, not the Appellant, and that she was "110 percent sure" the Appellant was in bed with her when the Cavalier hit the light pole. She stated that the officers did not investigate the case properly because they should have obtained video from Tommy's Tavern. Had they done so, they would have seen that the Appellant was not there. Sharpe said that she spoke with the owner of the business and that video was available. The State asked if Sharpe ever tried to determine who was driving her Cavalier on October 18, and she answered, "It's not my job to find out who was driving, it's just my job to tell you it wasn't David Sharp." She acknowledged that her brother could have given Officer Thomson the wrong name and stated that while her brothers looked alike, they did not look like the Appellant.

Cynthia Chapin, Christina Sharpe's mother, testified that the Appellant had been in a relationship with Sharpe for four years. Sharpe and the Appellant lived downstairs in

- 8 -

Chapin's basement, which they had turned into a two-bedroom apartment. Chapin explained that when visitors arrived, they would go to the main door upstairs. The door to the basement was on the right side of the home, and "their separate driveway goes to the right side of the house."

Chapin testified that in October 2014, the Appellant was clean-shaven. In the early morning hours of October 18, Chapin's dog woke her by jumping off the bed. She looked outside, saw the police drive up, and woke her husband. The police told her husband that they were looking for the Appellant because he "had supposedly hit a pole and took off and got away from them." They asked Chapin's husband if the Appellant was present. Chapin knew he was downstairs but did not say anything to the police.

Chapin testified that after the police left, she ran downstairs, knocked on the door, and called for the Appellant. He came out of the bedroom, and Chapin told him the police were looking for him. She said that the Appellant was wearing shorts, that he was "still asleep," and that she did not smell alcohol. The Appellant did not seem to know what was going on, and everyone went back to bed.

On cross-examination, Chapin testified that Sharpe and the Appellant owned one dog, a pit bull. After the officers left Chapin's home, the officers did not go to the downstairs apartment and knock on the door. She said she was sure they did not go downstairs because she would have heard people talking and the pit bull barking. Chapin acknowledged that the Appellant was not supposed to be around Sharpe at the time of the incident. She said police officers continued to come to her home for about ten days, looking for the Appellant. The Appellant was not living there at that time, and she told them where he lived. Chapin had five sons. They did not live with her but visited her home regularly, and she did not discuss the incident with them. She said the Appellant did not hit the light pole at Tommy's Tavern on October 18 because she knew "for a fact he was downstairs."

Gerald Sharp, the Appellant's father, testified that he had regular contact with the Appellant and that the Appellant was clean-shaven with no mustache or goatee in October 2014. He said he had no idea who was driving the Cavalier on October 18, 2014.

On cross-examination, Mr. Sharp testified that he defined a goatee as "a chin piece" and that the Appellant had never had a goatee. At some point in his life, though, the Appellant had a full beard. The State showed Mr. Sharp a photograph of the Appellant, and he said the photograph did not show the Appellant with a goatee because the Appellant's face looked "shaded on the sides." The State moved to introduce the photograph into evidence as exhibit nine, and the trial court allowed the photograph into evidence over the Appellant's objection as "[r]ebuttal proof."

On redirect examination, Mr. Sharp testified that the Appellant was twenty-six years old at the time of trial and that the Appellant was "[m]aybe 19" when he first had facial hair. Defense counsel showed Mr. Sharp exhibit nine. Mr. Sharp said that in October 2014, the Appellant did not have the appearance shown in the photograph. Mr. Sharp did not know when the photograph was taken.

The jury convicted the Appellant as charged of evading arrest, a Class E felony, and driving on a revoked license, a Class B misdemeanor. After a sentencing hearing, he received concurrent sentences of eighteen and six months, respectively. The trial court ordered that the Appellant serve the effective eighteen-month sentence as ninety days in jail and the remainder on supervised probation.

## A. Exhibit Nine

The Appellant raises several issues regarding the admissibility of exhibit nine, the photograph introduced into evidence by the State during his father's cross-examination. All of the issues relate to the following colloquy between the State and Gerald Sharp:

Q.     Has David ever had a goatee?

A.     No, sir.

Q.     He's never had a goatee in his life?

A.     No, sir, full, full.

THE COURT:  Full did you say?

THE WITNESS:  Years ago, I mean the way his hair grows, he has a goatee. I describe a goatee as a chin piece. He's always had it all the way around at one time.

BY [THE STATE]:

Q.     So he's had a full beard?

A.     At one time in his life, yeah.

Q.     Okay. How long ago was that?

A.     I don't recall.

Q.     Okay. But you never recall him having just, just a goatee?

- 10 -

A. No, sir.

Q. Okay.

[THE STATE]: May I approach the witness, Judge?

THE COURT: Sure.

By [THE STATE]:

Q. Who is that in the picture?

A. (Witness reviews document.) That's my son.

Q. Does he have a goatee in that picture?

A, No, sir. A goatee is just --

THE COURT: Out loud so the jury can hear your answer.

THE WITNESS: Okay. A goatee, I describe a goatee as a -- as a chin piece.

BY [THE STATE]:

Q. Not here, the top, the mustache piece of it?

A. Well, I don't understand. It's this right here.

Q. Okay. Okay. So I want to make sure we're both talking about goatees. I define a goatee as just this area right here where the mustache goes down at the chin area.

A. Okay. I understand.

Q. Has he ever had that?

A. Not that I'm aware of.

Q. You saw the photo I showed you?

A. Yes, sir.

Q.     Did he have that goatee at that point?

A.     Well, I don't know -- I don't know how to answer that question.  To me, it was wider on his face than -- than there.

Q.     Do I need to show it to you again?

A.     Well, show me what you're describing.

Q.     I'm describing a goatee as a mustache part as well as the chin part.

A.     Okay.

Q.     Connecting down all the way.

A.     Okay.

Q.     Does he have those features in that picture?

A.     The shadow is dark on the side, so I really can't -- can't tell by that photograph, because it's shaded on the sides.

Q.     And that is your son?

A.     Yes, sir.

. . . .

THE COURT:  Do you need some scissors just to cut the picture out?

[THE STATE]:  That would be good, Judge.

. . . .

[THE STATE]:  Judge, the State would move to have this photo of [David] Sharp entered as State's exhibit.

THE COURT:  9.

[DEFENSE COUNSEL]:  Your honor, the defendant will be objecting.  This photo was never turned over to [the] defendant at all during

the discovery process. We were returning photos back and forth. I've never seen this photo. I would say it's an unfair surprise, Your Honor.

[THE STATE]: That's a fair argument, Judge.

THE COURT: Rebuttal proof usually comes in as part of the truth testing process.

[DEFENSE COUNSEL]: Your Honor, I would also object under the premise of there was no date of when that was taken and that's just going to cause confusion. I mean, we're dealing with a specific time period. I mean, he could have had facial hair anytime in the last ten years.

[THE STATE]: I'm not introducing it to show that he actually had facial hair on that specific date only the fact that he did at some point in his life have facial hair.

[DEFENSE COUNSEL]: Well, the witness, Your Honor, has agreed that he had facial hair at some point in his life.

THE COURT: No, I don't think so. I think he testified that he never had just a goatee. I'm going to fix it like this on this piece of notebook paper, so we won't lose it. It's admitted as Exhibit 9 and may be passed to the jury.

During deliberations, the jury sent out the following four questions to the trial court: "What is the date of the photo, and where is the photo from; why was it taken; is the photo from his driver's license; is this the photo that was used to ID David Sharp?" The trial court offered to reopen the proof "by agreement" so that the parties could answer the questions for the jury or "submit a one-sentence response that says we cannot reopen the evidence part of the trial, but you are reminded that the jury may make reasonable inferences from the evidence that is already before you." The court stated that it preferred the former option because "I would rather not keep jurors in the dark if we don't have to."

The trial court, apparently looking at exhibit nine closely for the first time, then stated as follows:

> I think [the jury will] infer that this is the picture that the officers saw on the Department of Safety website probably, but I don't know. I didn't realize that the little words criminal justice portal DL record party C was in that upper corner [of the photograph]. I thought we were getting

- 13 -

off all the words. And then there's a little bit of cornering here [on the photograph] saying something about disseminated. There may be some jurors assuming it's an indication of worse criminal activity, some assuming that the officers were unduly influenced by what they saw in the computer instead of what they saw through the car windows.

. . . .

And then as I look closer at Exhibit 9, I do think there's a fine line of hair that goes up on the defendant's jaw toward his ear. It might not be considered typical full beard, but it might customize it beyond the standard goatee.

The trial court asked if the State knew where the photograph "was from," and the State answered that it thought exhibit nine was the Appellant's official driving record photograph.

Regarding reopening the proof, the State advised the court that it was trying to avoid entering the exhibit for the purpose of proving "that's what they saw that night" because the State did not have any proof as to when the photograph was taken. The State said, "I didn't want to muddy the water by saying this is the photo, but it might have been taken last week or, you know, two weeks ago versus two years before the date." Both parties objected to reopening the proof. When the jury entered the courtroom, the trial court gave the following instruction:

So the Court's official response to your questions is this[:] we cannot reopen the evidence part of the trial, but you are reminded that the jury may make reasonable inferences from evidence that is already before you. . . . Sometimes if you do not directly know what you want to know, maybe you can figure it out from circumstantial evidence that gives you reasonable inferences of what that direct evidence might have been if you did hear it.

The jury resumed deliberations and ultimately convicted the Appellant as charged.

1. Rebuttal Evidence

First, the Appellant contends that the trial court erred by admitting the photograph into evidence to rebut Mr. Sharp's testimony that the Appellant never had a goatee because the photograph showed him with a "full" beard, not a goatee. The State argues that the Appellant has waived this issue because he "does not cite a controlling rule of

- 14 -

evidence or any other authority suggesting that the photograph was inadmissible" and that "[n]either the State nor this Court should be expected to guess as to what Defendant's precise objection is." The State also argues that, in any event, the photograph was admissible because it was "relevant to the question of whether Defendant ever had a goatee." We conclude that the issue is not waived and that the trial court's admitting the photograph into evidence as rebuttal proof was reversible error.

Regarding the State's waiver argument, the Appellant claimed at trial that introducing the photograph for the purpose of showing he had facial hair at some point in his life was not relevant to his having facial hair on the night of the crimes. On appeal, he contends that the photograph was not relevant because it did not show him with a goatee on October 18, 2014. Although he does not cite to our rules of evidence regarding relevance in his brief, we think the context of his argument is apparent. We note that while the State claims it should not have to guess as to the Appellant's "precise objection," the State then argues that the photograph was relevant and cites Tennessee Rules of Evidence 401 and 402. Thus, we conclude that the Appellant has not waived the issue.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Usually, relevant evidence will be admissible. Tenn. R. Evid. 402. "Rebuttal evidence is 'any competent evidence which explains or is in direct reply to or a contradiction of material evidence introduced by the accused.'" State v. Thompson, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (quoting Nease v. State, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979)). "The state is given the right of rebuttal because it 'does not and cannot know what evidence the defense will use until it is presented at trial.'" Id. (citing State v. Cyrus Deville Wilson, No. 01C01-9408-CR-00266, 1995 WL 676398, at *4 (Tenn. Crim. App. at Nashville, Nov. 15, 1995)). "Like any other evidence, rebuttal evidence must be relevant and material to the facts at issue in the case." State v. Lunati, 665 S.W.2d 739, 747 (Tenn. Crim. App. 1983). The admission of rebuttal evidence is within the sound discretion of the trial court, and we will not overturn the trial court's decision absent an abuse of that discretion. See State v. Dellinger, 79 S.W.3d 458, 488 (Tenn. 2002).

The trial court ruled that the photograph was admissible to rebut Mr. Sharp's claim that the Appellant never had a goatee. We note that the photograph also impeached Mr. Sharp's credibility. To this regard, our supreme court has explained,

> When "fact contradiction" involves controverting the testimony of a witness, it is sometimes viewed as a process of witness impeachment. See N. Cohen, et al., Tennessee Law of Evidence, § 6.07[4], at 6-57 through 62 (4th ed. 2000). In a broader sense, however, when evidence contradicts

> material, adjudicative facts, the real efficacy of the evidence is substantive fact rebuttal that <u>incidentally</u> impeaches a fact or fact witness. <u>See</u> <u>State v. Electroplating, Inc.</u>, 990 S.W.2d 211, 231, n.17 (Tenn. Crim. App. 1998). In other words, when "fact contradiction" evidence is relevant to the issues on trial, it is generally admissible as substantive evidence. <u>Id.</u>; <u>see</u> Tenn. R. Evid. 402.

<u>State v. McKinney</u>, 74 S.W.3d 291, 317 (Tenn. 2002).

Turning to the instant case, Mr. Sharp testified on cross-examination that he considered a goatee to be "[just] a chin piece" whereas the State advised him that it considered a goatee to be "a mustache part as well as the chin part." <u>Merriam-Webster's Dictionary</u> defines "goatee" as "a small pointed or tufted beard on a man's chin." <u>Merriam-Webster Online Dictionary</u>, http://www.merriam-webster.com/dictionary/goatee (last visited August 7, 2017). <u>The Free Dictionary</u> defines "goatee" as "a small chin beard, especially one connected to a mustache or trimmed into a point." <u>The Free Dictionary</u>, http://www.thefreedictionary.com/goatee (last visited August 7, 2017).

The black and white photograph at issue is a close-up, frontal view of the Appellant's face and shows him with a mustache connecting to a neatly-shaved area of hair on his chin. It also shows him with what appears to be hair on the lower sides of his face, well-below his cheeks. While the trial court expressed concern as to whether the "fine line of hair" on the Appellant's lower face "might customize it beyond the standard goatee," his cheeks are clean-shaven so that the mustache and hair on his chin are prominently displayed. Moreover, at the Appellant's motion for new trial hearing, the trial court asked defense counsel, "I agree, there is a thin line of hair growing up his jaw toward his ear. But someone looking through a window [in] a dark parking lot could easily conclude that it was a goatee. Right?" Defense counsel answered, "I think they could, Your Honor[.]" We think the hair on the Appellant's chin in the photograph meets the definition of a goatee. Thus, we turn to whether the photograph was relevant to rebut Mr. Sharp's testimony that the Appellant never had a goatee.

The officers testified that the Appellant had a goatee on October 18, 2014. The Appellant's defense was that this was a case of mistaken identity. In support of that defense, his father testified that the Appellant was clean-shaven in October 2014 and denied on cross-examination that the Appellant ever had a goatee. Obviously, a photograph showing the Appellant with a goatee on or near the night of October 18 would have been relevant to the State's case and relevant to rebut Mr. Sharp's testimony that the Appellant was clean-shaven on the night of the offenses. However, the Appellant's having a goatee "at some point in his life" that did not include October 18, 2014, would not have been relevant.

The State essentially advised the trial court that it could not show the photograph was relevant because the State did not know when the photograph was taken. In fact, the State advised the court that the photograph could have been taken just one or two weeks before trial. Moreover, the State said at the Appellant's motion for new trial hearing that it introduced the photograph into evidence to impeach the witness, not to show that the Appellant had a goatee "on that night." Therefore, we conclude that the photograph was irrelevant to any issue on trial and admissible only to impeach Mr. Sharp's testimony that the Appellant never had a goatee. The photograph was not admissible as substantive evidence of the Appellant's having a goatee on the night of the crimes, and the trial court should have instructed the jury that the photograph could be used only to impeach Mr. Sharp's credibility.

We further conclude that the trial court's failure to give a limiting instruction was reversible error. The jury's questions demonstrate that it was confused about how to consider the photograph. Upon reading the questions, even the trial court expressed concern about leaving the jury "in the dark" and stated that the jury probably would infer that the photograph was the one the officers viewed on Officer Thomson's computer. Without a limiting instruction, we think the jury likely considered the photograph as substantive proof that the Appellant had a goatee on the night of the crimes, meaning the photograph was valuable to the State's case and extremely damaging to the defense. Although the State's case was strong, it was not overwhelming. Therefore, we cannot say that the trial court's error in admitting the photograph was harmless. See Tenn. R. App. P. 36(b). Accordingly, the Appellant's convictions are reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

2. Tennessee Rule of Evidence 403

In a related argument, the Appellant contends that the photograph was inadmissible under Tennessee Rule of Evidence 403 because the State offered no information about the photograph, leaving the jury "to speculate about the origin and purpose of the photograph as well as whether or not the photograph was the same picture used by the police to 'ID' Appellant." The State argues that the photograph was not unfairly prejudicial. Although we have concluded that the photograph was not relevant to any issue on trial, we will address the Appellant's claim in the event of further appellate review.

Tennessee Rule of Evidence 403 provides that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." When the State moved to introduce the photograph into evidence, defense counsel specifically argued that the undated photograph would confuse the jury. However, the trial court did not address Rule 403 until the jury sent out the four questions during deliberations. At that

point, the court recognized that the jury indeed was confused about the photograph. Although the court offered to reopen the proof so that the parties could answer the questions rather than "keep jurors in the dark," defense counsel objected to reopening the proof.

If the photograph was relevant, it was relevant only to rebut Mr. Sharp's claim that the Appellant never had a goatee. The jury's questions, though, show that the jury was trying to determine if the undated photograph was relevant to the Appellant's having a goatee on the night of the crimes. The State conceded at the Appellant's motion for new trial hearing that the photograph "tended to prove that he did have a goatee [on October 18, 2014]." Again, the probative value of the photograph was slight whereas the danger of confusion was great. Accordingly, we agree with the Appellant that the photograph, if relevant, was inadmissible under Tennessee Rule of Evidence 403.

3. Tennessee Rule of Evidence 404(b)

The Appellant claims that the words "criminal justice portal," which appeared above the photograph, "create[d] an unacceptable inference of prior bad acts" in violation of Tennessee Rule of Evidence 404(b). The State claims that the Appellant has waived this issue and that it does not rise to the level of plain error. We agree with the State.

Tennessee Rule of Evidence 404 prohibits evidence of a defendant's other crimes, wrongs, or acts offered to show a character trait in order to prove that the defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b). When the State sought to introduce the photograph into evidence, the trial court offered the State a pair of scissors in order to cut out "just" the photograph. The trial court then taped the photograph to a piece of paper. After the jury sent out the four questions, the trial court noticed that the State had left the words "criminal justice portal" on the photograph and stated that some jurors might assume "it's an indication of worse criminal activity." However, the Appellant never said anything about the wording on the photograph, let alone made any argument regarding Rule 404(b). Thus, the issue has been waived. See Tenn. R. App. P. 36(a)

Regarding plain error, this court has stated that a defendant's failure to object pursuant to Tennessee Rule of Evidence 404(b) and request a 404(b) hearing hampers our ability to determine whether a clear and unequivocal rule of law was breached. State v. Jeremy Sims, No. W2013-01253-CCA-R3-CD, 2015 WL 5683755, at *14 (Tenn. Crim. App. at Jackson, Sept. 25, 2015), perm. to appeal denied, (Tenn. Jan. 19, 2016). Regardless, the words "criminal justice portal" do not necessarily impute prior bad acts to the Appellant. We note that "DL Rec," which apparently referred to the fact that the photograph came from the Appellant's driver's license record, appeared directly to the right of "criminal justice portal." The trial court stated that the jury probably would assume the photograph was the one the officers saw from the Department of Safety.

Therefore, we cannot say that an unequivocal rule of law was breached and discern no plain error. See State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

4. Discovery of Photograph

Finally, the Appellant contends that the photograph was inadmissible because the State did not turn it over to him before trial as required by Tennessee Rule of Criminal Procedure 16(a)(1)(F). The State argues that it was not required to disclose the photograph. We conclude that the Appellant is not entitled to relief.

Tennessee Rule of Criminal Procedure 16 governs the discovery rights of parties in criminal proceedings. Rule 16(a)(1) provides, in pertinent part, as follows:

> (F) Documents and Objects. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph . . . photographs . . . or copies . . . thereof, if the item is within the state's possession or control and:
>
> > (i) the item is material to preparing the defense;
> >
> > (ii) the government intends to use the item in its case-in-chief at trial; or
> >
> > (iii) the item was obtained from or belongs to the defendant.

"Evidence is deemed to be material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Johnson v. State, 38 S.W.3d 52, 58 (Tenn. 2001) (quoting State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995)). The Appellant bears the burden of demonstrating "the degree to which the impediments to discovery hindered trial preparation and defense at trial." State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992).

We reiterate that the trial court's admitting the photograph into evidence constitutes reversible error. That said, the Appellant contends, without any explanation, that the photograph was "clearly" material to his defense. See Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). At the Appellant's motion for new trial hearing, defense counsel argued that the photograph was material because he could have "prepped" the Appellant's father for the photograph and could have asked the Appellant about it. However, defense counsel could have requested a continuance or recess in which to discuss the photograph with Gerald Sharp or question the Appellant. See State v. Eric Williams, No. W2013-01593-CCA-R3-CD, 2015 WL 1453389, at *16 (Tenn. Crim. App. at Jackson, Mar. 27, 2015). Thus, we conclude that the Appellant is not

entitled to relief on this issue.  See Tenn. R. App. P. 36(a).

## B.  Sufficiency of the Evidence

The Appellant claims that the evidence is insufficient to support the convictions and that the trial court erred by denying his motion for judgment of acquittal after the close of the State's proof.  Specifically, he contends that the evidence is insufficient because of "vast" inconsistencies in the police officers' testimony, his witnesses testified that he was clean-shaven in October 2014, and Christina Sharpe's Facebook photograph showed him to be clean-shaven.  The State argues that the evidence is sufficient.  Again, we will address the Appellant's claim in the event of further appellate review.  We conclude that the evidence is sufficient to support the convictions.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).  The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact.  State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury.  Id.  Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).  "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'"  State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).  This court has observed that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction."  State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App.

2000).

Taken in the light most favorable to the State, the evidence shows that in the early morning hours of October 18, 2014, someone backed Christina Sharpe's white Chevrolet Cavalier into a light pole in the parking lot of Tommy's Tavern. Police officers in the parking lot ran to the car and ordered the driver to stop, but the driver sped away. Officer Thomson, Sergeant Goats, and Officer Holland testified that they were able to see the driver and that the driver was the Appellant. Although the Appellant contends that the evidence is insufficient because of inconsistencies in the officers' testimony, the jury obviously resolved those inconsistencies in favor of the State. Moreover, although the Appellant contends that the evidence is insufficient because all three of his witnesses testified that he was clean-shaven in October 2014, the jury, not this court, was in the best position to assess the credibility of the witnesses. We note that Cynthia Chapin testified that she knew the Appellant was downstairs when the officers came to her home shortly after the incident, yet she failed to reveal that information to the officers. Additionally, Christina Sharpe and the Appellant were in violation of a court order by allegedly being together on October 18, and Sharpe lied to officers about her and the Appellant's whereabouts at the time of the crimes.

Regarding the photograph Christina Sharpe took of the Appellant, the Appellant argues that the photograph proves he was clean-shaven on October 18 because the photograph is "time stamped" October 13. However, Sharpe acknowledged that the date on the photograph referred to the date she uploaded the photograph to Facebook, not the date she actually took the photograph, and that she could have taken the photograph anytime. Accordingly, we conclude that the evidence is sufficient to support the convictions.

## III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court committed reversible error by admitting exhibit nine into evidence because the photograph was not relevant rebuttal proof. Therefore, the Appellant's convictions are reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

_____
NORMA MCGEE OGLE, JUDGE